IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LAKISHA SHORT, | : |
| Plaintiff, | : |
| v. | : Civ. No. 08-106-LPS |
| WARDEN PATRICK RYAN, et al., | : |
| Defendants. | : |

Lakisha Short, Delores J. Baylor Women's Correctional Institution, Wilmington, Delaware, Pro Se Plaintiff.

Kevin R. Slattery, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Attorney for Defendants Patrick Ryan and Colleen Shotzberger.

James Edward Drnec, Esquire, Balick & Balick, LLC, Wilmington, Delaware. Attorney for Defendant Correctional Medical Services, Inc.

**MEMORANDUM OPINION**

October 1, 2010
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff, Lakisha Short ("Short"), an inmate housed at the Delores J. Baylor Women's Correctional Institution in Wilmington, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983. She appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (D.I. 4) Pending before the Court are several motions filed by the parties, including motions for summary judgment filed by Defendants Warden Patrick Ryan ("Ryan") and Colleen Shotzberger ("Shotzberger") (together, the "State Defendants"), as well as Correctional Medical Services, Inc. ("CMS"); numerous motions to strike; a request for counsel; and discovery motions. (D.I. 56, 57, 65, 77, 81, 91, 95, 99, 105, 107, 109, 115, 120) For the reasons that follow, the Court will grant Defendants' motions for summary judgment.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Following screening of the original Complaint, the Court allowed Short to proceed with discrimination claims against Ryan and Shotzberger and a medical needs claim against CMS, pursuant to 42 U.S.C. § 1983.[1] More particularly, Short alleges discrimination by reason of sexual orientation and race and deliberate indifference to her serious medical needs by:

---

[1] Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Defendants Carl Danberg and Deputy Commissioner Thomas Carroll were dismissed at the screening stage. (D.I. 20, 21)

1

(1) failing to provide, or denying access to, exercise and exercise equipment; (2) failing to timely address abdominal and urological complaints; (3) failing to provide adequate access to mental health providers; and (4) forcing inmates to purchase "comfort medicines."

Upon motion, the December 15, 2009 discovery deadline was extended to January 15, 2010, and the February 15, 2010 dispositive motion deadline was extended to March 1, 2010. (D.I. 41, 49, 50, 69, 70) Defendants filed their motions for summary judgment in February and March, 2010. Reply briefs, as well as sur-reply briefs, were filed by the parties. Short and Defendants have moved to strike reply briefs and/or sur-reply briefs and other filings. (*See* D.I. 95, 99, 105, 107, 109, 120) The Court will grant the motions to strike filed by Defendants inasmuch as Short filed sur-reply briefs and other documents in derogation of the Federal Rules of Civil Procedure and the Local Rules of this Court. The Court will deny as moot Short's Motion for an Extension of Time (D.I. 115) to file a sur-reply. The Court will also deny Short's motions to strike reply briefs, as there is nothing improper about their filing. In addition, Short filed a Request for Counsel, a Motion to Take the Depositions of the Defendants, a Motion to Compel, and a Motion for Extension of Time. (D.I. 56, 57, 77, 91)

Short has been incarcerated since 2003 and is serving a fifty-five year sentence. (D.I. 82, ex. B) She was moved between the medium and maximum security housing units in 2005 and 2006. (*Id.*) Inmates housed in maximum security remain in their cells twenty-three hours each day and are given one hour for recreation at least three days per week. (*Id.* at ex. A) Short refers to this as "twenty-three by one" status. (*Id.*) Short's placement in maximum security, and into isolation, occurred as a result of institutional misconduct after she was found guilty of assaulting her roommate on May 6, 2005. (*Id.* at exs. A, B) Short was later moved to a medium security

unit but, on February 16, 2006, she assaulted another inmate, and was again housed in isolation and then in the maximum security housing unit. (*Id.* at ex. B) On April 17, 2006, Short committed a serious security breach and was taken to an isolation cell. (*Id.*) At this point, Short was classified to maximum security. (*Id.*) At Short's reclassification review, held on April 20, 2006, Ryan and Shotzberger voted to override the classification so that Short could participate in mental health programming; she was placed in a medium security housing unit. (*Id.* at exs. A, B)

On December 7, 2006, Ryan approved Short for a kitchen job. (*Id.* at ex. B) However, Short was then involved in an altercation with another inmate, and both inmates lost their kitchen jobs. (*Id.*) On March 5, 2007, Short was discovered engaging in sexual relations with another inmate and was transferred to an isolation cell. (*Id.*) During the transfer she passed a bundle containing medication to another inmate and was charged with a drug offense. (*Id.*)

Next, Short and inmate Jan White ("White") were involved in an altercation in the gym on April 13, 2007. (*Id.*) Both were charged with fighting and both were taken to isolation cells. (*Id.*) On May 19, 2007, Short refused to lock up in her cell, used profane language, and acted as if she wanted to fight. (*Id.*) She was charged with another disciplinary violation. (*Id.*) Short was placed in prehearing detention and then administratively transferred to maximum security as a result of the accumulation of Class 1 violations.[2] (*Id.*) On August 10, 2007, after Short attempted to assault White, Short was charged with an offense and moved to an isolation cell. (*Id.*) From July 2007 through July 2008, Short continued to receive write-ups. (*Id.*) Nonetheless, during her June 12, 2008 maintenance review, Short was given a job on her unit.

---

[2]The record reflects that Short was found guilty of most of the violations with which she was charged.

(*Id.*) The number of violations she received decreased and, by February 12, 2009, Short was recommended for a transfer to a medium security unit. (*Id.*) She was transferred to medium security on April 3, 2009 and has remained there since. (*Id.*) Short has an institutional job and is enrolled in programming. (*Id.*)

According to Ryan and Shotzberger, Short's sexual orientation has nothing to do with her classification and security risk assessment; her classification and security risk assessment are, instead, the result of Short's own behavior and disciplinary history. (*Id.* at exs. A, B) Short testified that she was told by correctional officers Mowbray, Kearney, and Gardley that she was disciplined more severely because of her race and sexual orientation. (*Id.* at ex. I 15-16) She has no direct evidence of Ryan's involvement. (*Id.* at I 17) She testified that Shotzberger was involved because she is the head of treatment services, which makes all status decisions for housing, employment, and placement in maximum security status. (*Id.* at I 15-16) Short acknowledged that her infractions had something to do with her housing status but also believes that she was treated differently from other individuals serving long prison sentences because she was not liked. (*Id.* at ex. I 17-18)

Short submitted a grievance on January 8, 2008, complaining that she had been housed in maximum security since March 15, 2007 due to an incident of the same date, and further that, since May 21, 2007, she had been on twenty-three by one status "with no knowledge as to why." Short wanted to be "informed of reasoning for sanction and the period of time to be served." The investigation indicated that Short was classified to maximum security due to her history of institutional write-ups and recent altercations with other inmates, including fighting and sexual misconduct. (*Id.* at ex. J)

Medical records indicate that Short's complaints of abdominal and urological issues began in August 2006. (D.I. 67 at 1) In 2006, she received treatment for abdominal, urological, and gynecological conditions on August 15, September 13, September 21, and September 29. (*Id.* at 1-4) In addition, lab work was performed on October 6 and 8, 2006, and an ultrasound was performed on October 13, 2006.[3] (*Id.* at 1, 6-7) Short received further treatment on October 31, November 15 and 29, and December 6, 12, and 17, 2006.[4] (*Id.* at 1, 7-11)

Short continued to receive treatment in 2007. She was seen on January 4 and visited by medical on March 11, 2007, while was housed in isolation. (*Id.* at 11-12) She was seen on March 20 and the medical provider ordered a urinalysis. (*Id.* at 14) Short was next seen on April 23, 2007 and underwent an abdominal/pelvic CT scan. (*Id.* at 15-16) The results were discussed with Short on July 2, 2007. Medications were ordered in December 2007 and January 2008. (*Id.* at 17)

On January 14, 2008, Short was scheduled for lab and x-ray follow-up. (*Id.* at 20) She presented on February 26, and testing was performed on March 4, with a follow-up on March 18, 2008. (*Id.* at 38-40) Short was then seen on April 3 and medication and tests were ordered and performed on April 24. (*Id.* at 40) She was also seen on May 29 and 30 and June 5, 2008. (*Id.* at 51, 54, 55, 58) On June 9, 2008, Short was sent to a urologist, and the provider requested additional testing. (*Id.* at 56, 57, 59-61) An abdominal CT scan was performed on June 16, 2008, the results of which were reviewed with Short on June 18. (*Id.* at 62, 63) On June 24,

---

[3]The ultrasound results were normal. (*Id.* at 7)

[4]Short sought a medical clearance on December 9, 2006, to work in the kitchen. The form did not include any medical complaints.

2008, Short underwent a cystoscopy, bladder biopsy, and hydrodistention. (*Id.* at 65) Follow-up care was provided on June 30, 2008, and additional urology appointments were scheduled. (*Id.* at 67-68) Short was seen on July 14, as well as August 12, 14, and 18, and a urine sample was taken on August 29. (*Id.* at 67-69, 73) She was seen on September 1 and 22, 2008. (*Id.* at 75, 80, 81) Short was sent to the urologist on October 6, 2008, and seen by medical on October 9, 2008. (*Id.* at 83, 85) Short was sent to the urologist a second time on October 24, 2008. (*Id.* at 87) On November 7, 2008, Short was admitted to the infirmary for monitoring of her bladder voiding condition. (*Id.* at 89) In the latter part of 2008, Short's case, including the medication she was prescribed, was presented to the medical review committee. (*Id.* at 90)

In 2009, Short continued to receive treatment for her bladder condition. She was seen on January 26 and 31. (*Id.* at 94, 97) Short received medical treatment on February 5 and March 5, 7, and 12. (*Id.* at 95, 103, 105, 106) On April 3, Short was scheduled for surgery to implant a device for bladder control; the surgery took place on April 28, 2009. (*Id.* at 107) Medical care continued throughout May 2009. (*Id.* at 109-10)

Short sought mental health treatment in January 2008. Prior to that time she had received mental health treatment including medication prescribed by a psychiatrist. On January 7, 2008, she indicated that she no longer wanted the medication and she also refused it on January 12. (*Id.* at 23) She was evaluated on January 14, 2008. (*Id.* at 19) On January 21, 2008, Short indicated that she was not taking medication and advised mental health staff that she was "okay without it." (*Id.* at 25-28) She was seen on January 28 and again indicated that she no longer wished to take mental health medication. (*Id.* at 27) Medication was discontinued and Short was provided information on how to contact mental health. (*Id.*) Short received further mental health

treatment in 2008 on February 4, 6, and 13, March 6, 19, and 27, May 29, and July 2. (*Id.* at 29-35, 42, 43, 45, 52, 71) She received mental health treatment in 2009 on January 15 and some time prior to her classification review on February 12, 2009. (*Id.* at 92, 93, 98) She was also seen on March 6, 2009. (*Id.* at 101) During her deposition, Short testified that she received mental health treatment every time she sought it and was never denied treatment. (D.I. 66, ex. A8)

Short submitted a grievance on August 8, 2007, complaining that medical was not taking her bladder condition seriously. The matter was resolved with a change of medication. She submitted two grievances, one on August 23, 2007 and one on February 21, 2009, complaining that she was charged for sick calls. Short submitted a grievance on January 7, 2008, complaining that she had been housed in maximum security for approximately ten months, on twenty-three by one status, and requested that she be allowed to use the multi-purpose room for recreation at least once per week. The grievance was resolved in her favor and Short was given permission to use the room. She submitted another grievance on October 2, 2008, again complaining of lack of exercise. (D.I. 59)

### III. DISCOVERY MOTIONS

#### A. Motion for Leave to Depose

On January 13, 2010, Short filed a Motion for Leave to Depose (D.I. 57) Defendants Ryan, Shotzberger, and CMS.[5] All the Defendants object on the grounds that, as of the date of

---

[5]The Court applies the mailbox rule in determining the filing date. The computation of time for complaints filed by *pro se* inmates is determined according to the "mailbox rule." In *Houston v. Lack*, 487 U.S. 266 (1988), the United States Supreme Court held that a prisoner's

their response, Short had failed to respond to their discovery requests. (D.I. 58, 62) Short filed her request two days prior to the expiration of the January 15, 2010 discovery deadline.

The Court has no authority to finance or pay for a party's discovery expenses. *Badman v. Stark*, 139 F.R.D. 601, 605 (M.D. Pa. 1991) (§ 1915 does not require government to advance funds for deposition expenses); *Doe v. United States*, 112 F.R.D. 183, 184-85 (S.D.N.Y. 1986) (*in forma pauperis* statute does not require government to advance funds for deposition expenses); *Toliver v. Community Action Comm'n to Help the Econ.*, 613 F. Supp. 1070, 1072 (S.D.N.Y. 1985) (no clear statutory authority for the repayment of discovery costs for *pro se in forma pauperis* plaintiff); *Ronson v. Commissioner of Corr. for State of N.Y.*, 106 F.R.D. 253, 254 (S.D.N.Y. 1985) (indigent prisoner's motion to depose physician at corrections facility denied); *Sturdevant v. Deer*, 69 F.R.D. 17, 19 (E.D. Wis. 1975) (28 U.S.C. § 1915 "does not extend to the cost of taking and transcribing a deposition"); *Ebenhart v. Power*, 309 F. Supp. 660, 661 (S.D.N.Y. 1969) ("Grave doubts exist as to whether Section 1915 authorizes this court to order the appropriation of Government funds in civil suits to aid private litigants in conducting pre-trial discovery."). The taking of depositions would entail stenographic or court reporter expenses which this Court is not authorized to pay. It is Short's responsibility to pay for the costs associated with the taking of depositions, and she has made no showing that she is able to pay the expenses for the taking of the depositions.

---

notice of appeal of a habeas corpus petition was deemed filed as of the date it was delivered to prison officials for mailing to the court. While *Houston* dealt specifically with the filing of a habeas appeal, the decision has been extended by the Court of Appeals for the Third Circuit to other prisoner filings. *See Burns v. Morton*, 134 F.3d 109, 112 (3d Cir. 1998).

8

For the above reasons, the Court will deny the Motion for Leave to Depose the Defendants. (D.I. 57)

### B. Motion to Compel

Short filed a Motion to Compel (D.I. 77) Defendants to respond to discovery propounded upon them on January 13, 2010. CMS opposes the motion on the grounds that the requests were filed well after the expiration of the deadline. (D.I. 96) Nonetheless, during the pendency of this case, all Defendants responded to Short's discovery requests. (*See* D.I. 93, 94, 112, 113, 116) Accordingly, the Court will deny as moot the Motion to Compel. (D.I. 77)

## IV. STANDARD OF REVIEW

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). Moreover, "the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

Defendants move for summary judgment on the grounds that Short did not exhaust her administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), CMS was not deliberately indifferent to Short's medical needs, Short failed to allege or show that CMS established a policy or custom of deliberate indifference, Short has not established that she was a victim of discrimination, the State Defendants cannot be held liable on a respondeat superior theory, and the State Defendants are immune from suit. (D.I. 66, 82)

## V.  DISCUSSION

### A.  Exhaustion of Administrative Remedies

All Defendants move for summary judgment on the grounds that Short failed to exhaust her administrative remedies. CMS argues that, while Short produced copies of all her grievances, none are directed to any of her claims against it and, therefore, she failed to exhaust her administrative remedies. The State Defendants argue that Short's single grievance

concerning her classification to the maximum security housing unit was insufficiently detailed to place them on notice of her complaints and, therefore, fails to meet the exhaustion requirement.

As to exhaustion of administrative remedies and CMS, Short refers to the medical grievances she submitted. As to the State Defendants, she responds that on August 11, 2005 she attempted to grieve a classification issue in reference to housing and job issues but it was returned as "not grievable." She points out that she wrote several letters to "outside participants" requesting an "understanding," and Ryan and Shotzberger were aware of her housing classification issues. (D.I. 90)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *See Jones v. Bock*, 549 U.S. 199 (2007). Failure to exhaust administrative remedies must be pled and proven by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Under *Woodford v. Ngo*, 548 U.S. 81 (2006), exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance

with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88. As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA. *Jackson v. Ivans*, 244 F. App'x 508, 513 (3d Cir. Aug. 8, 2007) (not published) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.")). The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner*, 532 U.S. 731 (2001). "'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)).

Third Circuit case law makes clear that a prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *See Nickens v. Department of Corr.*, 277 F. App'x 148, 152 (3d Cir. May 12, 2008) (not published) (citing *Williams*, 482 F.3d at 639; *Spruill*, 372 F.3d at 228, 231). Delaware Department of Correction ("DOC") administrative procedures provide for a multi-tiered grievance and appeal process. DOC Policy 4.4 (revised May 15, 1998). First, the prisoner must file a grievance within seven days with the Inmate Grievance Chair, for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance Resolution Committee for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer conducts the final level of review. *Id.*

CMS' position that Short failed to exhaust her administrative as to the claims against it because it was not named in any of medical grievances is not supported by the laws. Section 1997e(a) does not require a prisoner to name all responsible officials in the administrative grievance in order to satisfy the exhaustion requirement. *See Jones,* 549 U.S. at 219. It is clear from Short's grievances that she raises issues regarding her medical treatment and care. Accordingly, the Court will deny CMS' motion for summary judgment (D.I. 81) on the issue of failure to exhaust administrative remedies.

As to the State Defendants, the record does not support a finding that Short exhausted her administrative remedies. Initially, the Court notes that the 2005 grievance to which Short refers in her response was submitted well before this lawsuit was filed and prior to the time of the events of which she complains. The more recent January 8, 2008 grievance regarding her classification in maximum security housing unit complains of Short's twenty-three by one classification status. (*See* D.I. 82, ex. J) At no point does it complain that Short was placed in maximum security because of discrimination based upon her sexual orientation or race. Indeed, the grievance makes no mention of discrimination. The grievance may have alerted officials to a potential problem regarding Short's classification, but it did not alert the State Defendants to the specific acts of unconstitutional discriminatory conduct that Short contends they allegedly committed. *See Johnson v. Townsend,* 314 F. App'x 436, 442 (3d Cir. Aug. 7, 2008) (not published) (prisoner failed to satisfy PLRA administrative exhaustion requirements when grievance did not contain all his complaints, he did not complete grievance process, and he failed to name certain officials). Finally, Short's letter-writing campaign did not fulfill the DOC exhaustion requirements. For the above reasons, the Court finds that Short did not exhaust her

13

administrative remedies with regard to the claims against the State Defendants. Therefore, the Court will grant the State Defendants' motion for summary judgment (D.I. 65) for failure to exhaust administrative remedies.[6]

### B. Medical Needs

Short alleges that CMS failed to provide adequate medical and mental health treatment. CMS argues that it is entitled to summary judgment on the grounds that it has no control over Short's housing or security decisions, Short's medical and mental health care was reasonable and appropriate, and Short failed to allege any policy or custom of deliberate indifference.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S.

---

[6]Even if Short had exhausted her administrative remedies on the claims raised against the State Defendants, liability cannot lie against them, as it is clear from her testimony that the claims are based upon their supervisory positions. It is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. *See Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937 (2009); *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 69 n.14 (3d Cir. 1993). A "defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal quotation marks omitted). There is no evidence of record of Ryan or Shotzberger's personal involvement in the alleged constitutional violations.

825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care but believes that more should be done (by way of diagnosis and treatment) and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Also, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

"[B]ecause respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). In order to establish that CMS is directly liable for the alleged constitutional violations, Short "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [she] allege[s]." *Id.* Assuming the acts of CMS's employees violated Short's constitutional rights, those acts may be deemed the result of a policy or custom of CMS, thereby rendering CMS liable under § 1983, if the inadequacy of existing practice is so likely to result in the violation of constitutional rights that

15

the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584. "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

The record reflects that Short has consistently been treated for all medical conditions of which she complains, including by receiving mental health treatment. While Short may allege that she has not received adequate medical or mental health care and treatment, the medical and mental health records tell a different story. Her medical record evidences that Short received continual medical treatment subsequent to her complaints in 2006 of onset of abdominal medical issues and continued in an ongoing effort to determine the cause of her problems. In addition, the record reflects that Short received mental health care whenever she requested it and was never denied such treatment. Short may not agree with the treatment rendered to her or the efficacy of the same, but it cannot be said that she was not provided medical treatment, or that the medical staff was deliberately indifferent to her medical and mental health needs. If indeed, she was provided improper medical care, at most this would give rise to a claim of negligence, which is not actionable under § 1983. Finally, Short produced no evidence that there was a

relevant CMS policy or custom, much less that such a policy or custom caused the alleged constitutional violations of which complains.

Short's claims are not supported by the record. No reasonable jury could conclude that a constitutional violation occurred. Therefore, the Court will grant CMS' motion for summary judgment. (D.I. 81)

## VI. CONCLUSION

For the above stated reasons the Court will grant Defendants' motions for summary judgment and will deny as moot Short's request for counsel. (D.I. 56, 65, 81) The Court will deny the discovery motions and Short's motions to strike. (D.I. 57, 77, 105, 109) The Court will grant Defendants' motions to strike and will deny as moot the motions for extensions of time. (D.I. 91, 95, 99, 107, 115, 120) An appropriate Order follows.